UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                         :

Giselle C Faure,                         :

                    Plaintiff,          :

                                             :

                  -against-          :

                                           :

Commissioner of Social Security,    :

                    Defendant.      :

                                           :
-------------------------------------------------------------X

**OPINION AND ORDER**

22-CV-1571 (KHP)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/7/2023

**KATHARINE H. PARKER, United States Magistrate Judge**.

       Plaintiff Giselle C. Faure, represented by counsel, commenced this action against

Defendant, Commissioner of the Social Security Administration ("SSA"), pursuant to the Social

Security Act ("Act"), 42 U.S.C. § 405(g).  Plaintiff seeks review of Defendant's decision that she

was not disabled as of March 25, 2019, the date of her application for Supplemental Security

Income benefits ("SSI"), and accordingly was not eligible for SSI on that date.[1]  Plaintiff and

Defendant both moved for judgment on the pleadings.  (ECF No. 23 ("Joint Stipulation").)  For

the reasons set forth below, the Court GRANTS Plaintiff's motion, and DENIES Defendant's

motion.

## BACKGROUND

       Plaintiff was born in 1984 and has a ninth-grade education.  (Administrative Record

("A.R.") 41-42, ECF No. 16.)  She has been unemployed since at least 2005 except for a brief

week of work in 2018 at a factory.  (*Id.* at 42-43.)

---

[1]  The alleged onset date for SSI is the date the application for benefits is filed, and benefits are limited to that
date.

On March 25, 2019, Plaintiff applied for SSI benefits because of her mental health disorders, including bipolar disorder, depression, and anxiety. (*Id.* at 78-79, 93, 180-190.) Plaintiff's claim was denied on August 30, 2019 (*id.* at 64-78, 94-99) and again upon reconsideration on March 3, 2020 (*id.* at 79-93, 104-09). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on May 10, 2020, which was held on November 17, 2020. (*Id.* at 101.) On December 2, 2020, Defendant denied Plaintiff's claim. (*Id.* at 13-33.) Plaintiff requested review by the Appeals Council on December 23, 2020, but the Appeals Council denied the request on January 28, 2022. (*Id.* at 1-6, 177-179.)

**1. Relevant Medical Evidence**

**a.** North Central Bronx Hospital

On February 11, 2019, Plaintiff's mother called EMS, reporting that Plaintiff had shown up to her apartment screaming and threatening Plaintiff's mother because Plaintiff wanted to live with her mother. (*Id.* at 658.) Plaintiff's mother reported that Plaintiff was not taking her medication and was worried Plaintiff would become physically aggressive. (*Id.*) However, Plaintiff said she went to her mother's house because her blood pressure was high. (*Id.*) Plaintiff was taken to North Central Bronx Hospital ("NCB"). (*Id.*) The record notes that Plaintiff has a history of five prior psychiatric admissions, including most recently at the time, at NCB in July 2018. Upon admission to NCB, Plaintiff was angry but was able to cooperate with the assessment. (*Id.*) Plaintiff was treated as an inpatient until she was released several weeks later on March 7, 2019. (A.R. 659.) Her treatment included individual therapy, group therapy, and medication, including Depakote, which is used to treat the manic phase of bipolar disorders, and Abilify injections, which are used to treat schizophrenia and bipolar disorder.

Plaintiff was diagnosed with bipolar disorder, severe and without psychotic features with a mixed current episode.  (*Id.*)

        b.  <u>VIP Community Services</u>

After being released from NCB, Plaintiff attended a follow up and case management session with Marc Hilaire, M.D., a doctor in internal medicine and specialist in addiction services at VIP Community Services,[2] which offers medical and behavioral health services.  (*Id.* at 1152.)  Plaintiff had been going to VIP Community Services since at least 2017.  (*Id.* at 858.) Plaintiff regularly visited VIP Community Services for medical and wellness treatment from the relevant time period in March 2019 to September 2020, which marks the end of the records collected for the ALJ's review.  (*Id.* at 2011.)  Plaintiff saw Dr. Hilaire for individual counseling and primarily saw Nurse Practitioner Reagan Anusionwu for psychiatric treatment.  Plaintiff also regularly attended group therapy beginning on March 21, 2019 ranging from three times a month in September 2019 to nine time a month in June 2019.  (*Id.* at 1153, 1162, 1169, 1186, 1188, 1195, 1199, 1207, 1257, 1266, 1271, 1279, 1285, 1322, 1324, 1329, 1331, 1336, 1355, 1361, 1503.)

Plaintiff saw Dr. Hilaire on March 22, 2019 for counseling and further follow up.  They discussed Plaintiff's housing situation, and Dr. Hilaire noted that Plaintiff "appeared in good spirits evidenced by her ease of speech and relaxed body language."  (*Id.* at 1160.)  On March 25, 2019, Plaintiff attended a detailed intake appointment with Dr. Ernest Jean to re-join a wellness program, which was halted because of her psychiatric hospitalization in February

---

[2] https://www.vipservices.org/about-us/mission/

2019.  (*Id.* at 1165.)  Plaintiff was screened for anxiety, in which she scored 6-10 points on the GAD-7 scale, reflecting moderate anxiety.  She also was screened for depression on the PHQ-9 scale and she scored a 9, reflecting mild depression.  Dr. Jean observed Plaintiff to be well groomed with appropriate clothing, she made good eye contact, was cooperative, alert, had clear speech, an organized thought process, coherent thoughts, good insights, good judgment, "adequate" attention span, and remote-intact recent memory.  (*Id.* at 1167-68.)  Plaintiff missed an April 2, 2019 wellness appointment, which meant an Abilify injection scheduled for the next day had to be cancelled.  (*Id.* at 1176.)  On April 5, 2019, Plaintiff returned to Dr. Hilaire for individual counseling.  Dr. Hilaire observed that Plaintiff had rushed and hurried speech when she first arrived but later appeared to return to "the normal range."  (*Id.* at 1184.)  Dr. Hilaire informed Plaintiff that her missed wellness appointment would extend her recovery and treatment timeline, and Plaintiff shared that she wanted to take care of her mental health.  (*Id.*)  On April 12, 2019, Dr. Hilaire saw Plaintiff for individual counseling during which Plaintiff discussed trying to improve her attendance.  Dr. Hilarie noted Plaintiff appeared to be within the normal range of affect and appearance and had a negative toxicology report for alcohol and substances.  (*Id.* at 1197.)

On April 15, 2019, Plaintiff attended a psychiatric evaluation with Reagan Anusionwu, NPP.  (*Id.* at 1201.)  Plaintiff informed NP Anusionwu that she had a stable mood, good sleep, good appetite, did not have affective symptoms.  She did not disclose any psychotic symptoms with the current medication.  (*Id.*)  Plaintiff did state that when she is not compliant with medications, her symptoms of paranoia and mood lability often re-emerge.  (*Id.* at 1202.)  NP Anusionwu observed Plaintiff as being well-groomed with good eye contact, and to have a

cooperative attitude, alert consciousness, normal and clear speech, appropriate mood, full affect, an organized and logical thought process, fair insight and judgment, an adequate attention span, and intact memory.  NP Anusionwu prescribed use of Abilify and Depakote to manage her bipolar disorder.  (*Id.* at 1205.)  On April 22, 2019, Plaintiff went to NP Anusionwu for a psychiatric follow up.  (*Id.* at 1215.)  NP Anusionwu observed that Plaintiff was continuing to minimize her mental health struggles and trying to convince NP Anusionwu that she did not have a mental illness and only continued to take the recommended medication because it is "court mandated." (*Id.*)  NP Anusionwu observed Plaintiff to be well groomed, with appropriate eye contact, cooperative attitude, and clear speech in the mental status exam. However, she also observed that Plaintiff had poor insight and a flat affect.  (*Id.* at 1217.)  NP Anusionwu prescribed an Abilify injection and set an appointment for April 26, 2019.  (*Id.* at 1215, 1217.)

On April 26, 2019, NP Anusionwu saw Plaintiff for a follow up appointment, during which Plaintiff displayed "mood lability, impulsivity" which justified a need for ongoing psychotropic and psychotherapeutic intervention.  (*Id.* at 1226-28.)  She also received the scheduled Abilify injection on the same day.  (*Id.* at 1233.)  On May 3, 2019, Plaintiff saw NP Anusionwu again with largely similar observations from the prior month.  (*Id.* at 1241.)  At a follow up appointment on May 6, 2019, Plaintiff described her feelings of frustration and her emotions about present stressors and future plans, reporting a fair mood.  (*Id.* at 1245.)  The

mental status exam was unchanged except that Plaintiff's affect was described as euthymic.[3] (*Id.* at 1247.)

Plaintiff continued to receive care in the form of psychiatric appointments with NP Anusionwu, counseling with Alison Maling, LCSW, and counseling with Dr. Hilaire from May 8, 2019 until November 2019.  Plaintiff's mental status exams were generally similar to the above-described exams and often indicated poor insight and fair judgment with occasional deviations from a full or euthymic affect to a fair affect.  (*Id.* at 1443, 1447, 1511.)  Throughout May 2019 to November 2019, Plaintiff mostly discussed stressors including ones involving her financial and housing difficulties; attempts to identify triggers to her anxiety, depression, and anger; and stress and anxiety from issues surrounding custody of her children.  (*Id*. at 1254, 1260, 1264, 1277, 1281, 1307, 1311, 1315, 1327, 1334, 1338, 1340, 1351, 1375, 1441, 1509.)  Plaintiff often reported feeling better or less depressed and was otherwise not forthcoming with psychotic symptoms.  (*Id.* at 1241, 1447.)

On November 4, 2019, Plaintiff attended a follow up appointment with NP Anusionwu who observed Plaintiff to appear slightly disheveled.  Plaintiff attributed her appearance to being displaced from her previous shelter and a state of homelessness.  (*Id.* at 1555.)  On the mental status exam, Plaintiff was observed to have a neutral mood, fair affect, fair insight, adequate attention span, and fair judgment.  (*Id.* at 1557.)  On November 15, 2019, Plaintiff attended a follow up with NP Anusionwu during which Plaintiff was observed to be "baseline stable" but with concrete thinking and intermittent residual symptoms under stress.  (*Id.* at

---

[3] Euthymia is often used to describe a state between depression and mania on a bipolar disorder continuum and is a state where "one typically experiences feelings of cheerfulness and tranquility."  *See* https://www.healthline.com/health/euthymic.

1565.) Plaintiff appeared to have issues around this time with remaining compliant with her program and attending sessions with her therapist. (*Id.* at 1561.) On December 4, 2019, Plaintiff saw LCSW Maling for individual counseling. Plaintiff discussed feeling hopeless, her recent noncompliance with her program, and her feelings of being overwhelmed with her mental health status. (*Id.* at 1574-75.) Plaintiff returned to group therapy on December 9, 2019 (*Id.* at 1577), and also went to a follow up appointment with NP Anusionwu (*Id.* at 1581). Plaintiff was noted to have improved affect. Plaintiff reported that she was compliant with her recommended medications, had good sleep and appetite, and had fairly controlled symptoms despite fluctuations due in part to unstable housing. (*Id.*) On her mental status exam, NP Anusionwu observed that Plaintiff had a neutral mood with fair insight and judgment. (*Id.* at 1583.) On March 30, 2020, NP Anusionwu observed that Plaintiff continued to have residual mood lability and impulsivity and noted that she was continuing her Abilify injections. (*Id.* at 1751.) They also discussed her need to be compliant with the medication. (*Id.* at 1753.)

On April 6, 2020, Plaintiff returned to NP Anusionwu for a psychiatric follow up and reported fairly managed symptoms with some episodes of an anxious mood, which she attributed in part to Covid-19. (*Id.* at 1759.) Plaintiff continued her treatment through September 30, 2020, describing some fluctuating symptoms of impulsivity and irritability but with no major changes in her mental status exams. (*Id.* at 1707, 1716, 1718, 1757, 1765, 1778, 1802, 1813, 1857, 1891, 1935, 1986, 2001, 2013.)

### c.  Seth Sebold, Ph.D. – SSA Consultative Examining Psychologist

On June 8, 2019, Dr. Seth Sebold, SSA Consultative Examining Psychologist ("Dr. Sebold") evaluated Plaintiff at the behest of the SSA. (*Id.* at 783.) Plaintiff reported that she

had a 9th grade education, is not employed, and that she worked in 2018 in a factory for a brief period of time.  (*Id.*)  Plaintiff reported that she had multiple psychiatric hospitalizations, including most recently in 2019 and that she receives regular outpatient treatment at VIP Community Services.  (*Id.*)  She reported symptoms including having difficulty falling asleep and only getting four hours of sleep a night; weight gain from increased appetite; depressive symptoms including dysphoric mood and crying spells; irritability; social withdrawal; anxiety in crowds and public transportation; nightmares; panic attacks including dizziness, breathing difficulty, and hot flashes; manic symptoms including talking or pressured speaking at a loud volume; psychomotor agitation including a flight of ideas and increased goal-directed activity; thought disorder including talking and laughing to her herself in the mirror; disorganized speech and behavior; and cognitive symptoms of short term memory deficits, concentration difficulties, and difficulty learning new material.  (*Id.* at 784.)  She reported no drug or alcohol history and a family history of psychiatric illness.  (*Id.*)

Dr. Sebold's mental status exam found that Plaintiff was cooperative; had a fair manner of relating, social skills, and overall presentation; was fairly groomed; and had clear speech, adequate expressive and receptive language skills, coherent thought process, full affect, and neutral mood.  Dr. Sebold opined that Plaintiff had mildly impaired attention and concentration with difficulty performing mental math including serial threes and sevens; mildly impaired recent and remote memory skills; below average intellectual function; and fair to poor insight and judgment.  (*Id.* at 785.)  Dr. Sebold conducted memory tests and noted that Plaintiff could immediately recall three out of three objects and could recall one out of three objects after several minutes.  (*Id.*)  Plaintiff reported that she showers and dresses herself, sometimes cooks

and cleans but waits for her mother to do it, does laundry, shops, and likes to walk but not take public transportation. (*Id.*) She stated that her family relationships are fair, and that she reads, exercises, and socializes. (*Id.* at 785-86.)

Dr. Sebold diagnosed Plaintiff with Bipolar I disorder, with psychotic features, high blood pressure, and other heart disease. (*Id*. at 786.) He opined that Plaintiff had a "moderate to marked" limitation in regulating emotions, controlling behavior, and maintaining well-being. (*Id.*) He also opined that she had "moderate" limitations in understanding, remembering, or applying complex directions and instructions, and in interacting adequately with supervisors, co-workers, and the public. He opined she had "mild to moderate" limitations in her ability to use reasoning and judgment to make work related decisions and in awareness of normal hazards and taking appropriate precautions. He also found a mild limitation in sustaining concentration and performing a task at a consistent pace and no limitation in her ability to understand, remember, or apply simple directions and instructions, sustain an ordinary routine and regular attendance at work, or to maintain personal hygiene and appropriate attire. (*Id.*)

Dr. Sebold noted that her evaluation appeared to be consistent with psychiatric problems that may significantly interfere with Plaintiff's ability to function on a daily basis. Dr. Sebold recommended psychiatric intervention, vocational training, and rehabilitation. He noted that Plaintiff's prognosis was "fair" provided the recommendations were implemented. (*Id.*)

### d. <u>Ann Marie Finegan, M.D. – SSA Internal Medicine Consultative Examiner</u>

On August 19, 2019, Dr. Ann Marie Finegan, SSA Internal Medicine Consultative Examiner ("Dr. Finegan") evaluated Plaintiff, who was accompanied by her mother. (*Id*. at 791.)

Plaintiff reported that she was diagnosed with mood disorder in 2006.  (*Id.* at 791.)  Plaintiff

reported that her medications have been adjusted and that she is doing better with the recent

change. Plaintiff also reported that her medication for elevated blood pressure led to some

palpitations, dizziness, and nausea.  She informed Dr. Finegan that she has been referred to

cardiology by her primary care provider.  Plaintiff largely reported similar symptoms and day-

to-day activity as she did to Dr. Sebold, and Plaintiff's mother said that Plaintiff seemed to be

doing better after her recent medication change.  (*Id.* at 794.)  On her mental status exam, Dr.

Finegan observed Plaintiff was dressed appropriately, maintained good eye contact, and

appeared oriented in all spheres.  (*Id.*)  Dr. Finegan saw no evidence of hallucinations,

delusions, impaired judgment, or significant memory impairment.  (*Id.*)  Plaintiff had a normal

affect and denied any suicidal ideation.  Dr. Finegan recommended Plaintiff not perform

activities at unguarded heights or on dangerous or moving equipment and deferred to the

psychologist evaluating her on the diagnosis of her mood disorder and any limitations because

of her mood disorder.  (*Id.* at 794-95.)

e.  Non-Examining State Agency Medical Consultants

Two medical consultant psychologists retained by the SSA reviewed the existing medical

source opinions and some treatment records to provide an opinion on Plaintiff's abilities – M.

D'Ortona, Psy.D. and E. Kamin, Ph.D.

Dr. D'Ortona reviewed Plaintiff's file on August 6, 2019 and opined Plaintiff had

"moderate" limitations in understanding, remembering, or applying information; interacting

with others; concentrating, persisting, or maintaining pace; and adapting or managing herself.

(*Id.* at 71.)  Dr. D'Ortona also opined Plaintiff was "moderately limited" in her ability to

remember locations and work-like procedures; understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others.  (*Id.* at 73-74.)  Dr. D'Ortona found no significant limitations in other categories and opined that Plaintiff retains the ability to perform demands of unskilled work with as-needed contact with coworkers, supervisors, and the public assuming Plaintiff remained medication compliant.  (*Id.* at 74.)

Dr. Kamin reviewed the record on February 21, 2020 and agreed with Dr. D'Ortona's findings.  (*Id.* at 86-90.)  Notably, neither Dr. D'Ortona nor Dr. Kamin appeared to review the treatment records from VIP Community Services in their opinions, though these records were requested from VIP Community Services multiple times.  (*Id.* at 65-69, 80-84.)

### 2.  Hearing before the ALJ

On November 17, 2020, ALJ Angela Banks conducted a telephonic hearing.  (*Id*. at 37.) Plaintiff was represented by counsel at the hearing.  (*Id.*)  At the hearing, Plaintiff testified that she is unable to work due to her mental illnesses and that she had previously tried to work in a factory in 2018 but had been laid off after a week because she had to keep calling out due to anxiety attacks.  (*Id.* at 42-43.)

She further testified that she takes medication for her conditions, including an injection of Abilify every month.  (*Id.* at 44.)  She also said that she takes Depakote as a pill.  She testified she gets dizzy, drowsy, loses her appetite, and gets a headache while on her medication.  (*Id.* at 44-45.)  She testified that she has had "plenty of" previous psychiatric hospitalizations including after November 2018.  (*Id.* at 45.)  She conceded she can be a little argumentative at times, can be very depressed, and doesn't like to be around people.  (*Id.* at 46-47.)  She testified that she feels the same with the treatment and doesn't know when she will feel better.  (*Id.* at 47.)  She also stated that she has anxiety and panic attacks once or twice a day due to not having custody of her two children and has trouble with her memory and concentration, particularly during a panic attack.  (*Id.* at 48.)  She testified that when she gets panic attacks, she blacks out and does not know where she is.  (*Id.* at 53.)

She testified that she lives with her mother but is working with her case managers to try to get her own supportive housing.  (*Id.* at 54.)  She stated she had a past history of substance abuse.  (*Id.*)  In terms of her daily schedule, she testified that she organizes, washes her clothes, and often goes to a therapist or psychiatrist.  (*Id.* at 56.)  She stated that she has group therapy three days a week.

Ruth Baruch, a Vocational Expert ("VE"), also testified at the hearing.  (*Id.* at 58.)  The ALJ asked the VE whether there was any work in the economy for an individual of Plaintiff's age, education, and work history who could not operate a motor vehicle as an occupation requirement or work at unprotected heights or around moving mechanical parts, and who was able to perform mental demands of work that require her to understand, remember, and carry out instructions consistent with occupations that can be learned in up to 30 days.  (*Id.* at 60.)

The VE testified that such an individual could work as a dishwasher, hand packager, and a price marker.  (*Id.*)  However, the VE testified that if the individual would be off task for 20% percent of the day in addition to normal breaks, the person could not work.  (*Id.*)  The VE also testified that if the individual was off task more than ten percent of the day, the person could not work. (*Id.*)

In response to Plaintiff's lawyer's questioning, the VE also stated that a person who had moderate limitations, which Plaintiff's counsel defined as meaning having problems up to one-third of the time working in interacting adequately with supervisors, co-workers, and the public, maintaining awareness of normal hygiene, and in taking appropriate precautions would not be able to work.  Further, the VE testified that someone markedly limited, defined as having trouble up to two-thirds of the time working, in her ability to regulate emotion, control behavior and maintain one's wellbeing would not be able to work.  (*Id.* at 61.)

### 3.  The ALJ's Decision

On December 2, 2020, ALJ Banks issued a decision finding Plaintiff was not disabled within the meaning of the SSA over the Relevant Period and accordingly was not entitled to SSI. (*Id*. at 13-29.)  The decision followed the established five-step sequential evaluation process for determining whether an individual is disabled.  *See* 20 C.F.R. § 416.920.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since March 25, 2019.  (*Id.* at 18.)  At step two, she determined that Plaintiff had severe impairments of bipolar disorder and depression, and that these impairments significantly limit Plaintiff's ability to perform basic work activities.  (*Id.* at 18.)  She also found non-severe impairments of hypertension and obesity.  At step three, the ALJ found that Plaintiff's

13

impairments did not meet or medically equal one of the listed impairments set forth in

Appendix 1 of 20 C.F.R. Part 404, Subpart P.  (*Id.* at 19-21.)  In making this finding, the ALJ first

considered whether the paragraph B criteria are satisfied.

To satisfy the paragraph B criteria, the impairments must result in one "extreme"

limitation or two "marked" limitations in any of the following four broad areas of functioning:

(1) ability to understand, remember, or apply information; (2) ability to interact with others;

(3) ability to concentrate, persist, or maintain pace; and (4) ability to adapt or manage oneself.

*See* 20 C.F.R. § 404.1520a.  The ALJ determined that Plaintiff has only "moderate" limitations in

three of these four areas and a "mild" limitation in adapting or managing herself.

As to the first area of functioning, the ALJ noted that Plaintiff testified she has difficulty

with short-term memory, that Dr. Sebold reported Plaintiff made errors on serial threes and

sevens and had difficulty with remote recall, and that Plaintiff needs reminders to take

medication.  (*Id.* at 20.)  However, the ALJ found the evidence indicated only a moderate

impairment because Dr. Finegan found no evidence of impaired judgment or significant

memory impairment and because Plaintiff could make simple calculations accurately and had

intact immediate recall with Dr. Sebold.  (*Id.*)  As to the second area of functioning, the ALJ

noted that Plaintiff testified to avoiding crowds, preferring to isolate, and having anxiety

attacks in public and pressured speech, but on the other hand, Dr. Finegan observed Plaintiff

was dressed appropriately, showed a normal affect, and made good eye contact; noted that

Plaintiff lives with family and shops in stores and was cooperative with treatment providers and

able to participate in group therapy.  (*Id.*)  As to the third area of functioning, the ALJ noted that

Plaintiff testified that she has difficulty concentrating, that Plaintiff made errors on serial threes

and sevens and digit span testing, but that Dr. Sebold found Plaintiff's attention and

concentration were only mildly impaired.  She also noted that Plaintiff reads for a hobby and

that Plaintiff stated in her function report that she can follow written and verbal instructions.

(*Id.*)  As to the fourth area of functioning, the ALJ stated that Plaintiff does not have a driver's

license and has difficulty shopping because of interacting with others, but that she nevertheless

is able to shop in stores, attend to her personal care, and reads as a hobby.  The ALJ also

characterized mental status exams of NP Anusionwu as "unremarkable." (*Id.*)

Having determined that the paragraph B criteria were not satisfied, the ALJ next

determined that the evidence failed to establish the presence of any paragraph C criteria,

because there was no evidence that Plaintiff has "marginal adjustment" defined as the

"minimal capacity to adapt to changes in her environment or to demands that are not already

part of her daily life."  (*Id.* at 21.)  ALJ Banks found the evidence showed Plaintiff is able to shop

in stores, live with her family, attend to her personal care, and read as her hobby.  (*Id.*)

The ALJ then turned to assessing Plaintiff's residual functional capacity ("RFC").[4]  The ALJ

considered Plaintiff's testimony, the medical record, and the medical source opinions in making

this assessment.  The ALJ acknowledged Plaintiff's testimony that she could no longer work

because of psychological symptoms and trauma, experiences anxiety attacks, has difficulty

being around others, experiences "black outs" and frequent panic attacks, is argumentative,

and isolates herself in her home.  (*Id.* at 22.)  The ALJ also noted that Plaintiff received inpatient

treatment, is treating her symptoms with counseling and psychiatric medications but that

---

[4]  The RFC is an "individual's maximum remaining ability to do sustained work activities in an ordinary work setting
on a regular and continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted).

Plaintiff believed her treatment has not improved her symptoms.  The ALJ found that Plaintiff's impairments could reasonably be expected to cause Plaintiff's described symptoms, but that Plaintiff's statements as to the intensity, persistence and effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record. (*Id.*)

The ALJ stated that the record demonstrated Plaintiff is not restricted beyond the restrictions articulated in the RFC and that Plaintiff has improved since receiving inpatient treatment in February 2019.  (*Id.* at 22.)  The ALJ characterized Plaintiff's inpatient treatment as being given in the context of Plaintiff's noncompliance with her medication regimen and found that Plaintiff's symptoms improved since release from hospitalization, noting Dr. Finegan's report that Plaintiff's mother indicated Plaintiff has been doing better since the most recent change in medication.  The ALJ also considered Plaintiff's past medical records and treatment from October 2018 to March 2019, including medication management, therapy, and her hospitalization in February 2019.  (*Id.* at 22-23.)

The ALJ also weighed the medical opinion evidence.  The ALJ found that Dr. Sebold's opinion was persuasive in part, noting that his finding that Plaintiff has a moderate to marked limitation in her ability to regulate emotions, control behavior, and maintain well-being was not supported by her cooperative behavior, full affect, normal speech, and appropriate affect in mental status examinations. (*Id.* at 24.)

The ALJ discussed Dr. Finegan's opinion, primarily focusing on her mental status exam and Plaintiff's mother's insights shared with Dr. Finegan that Plaintiff was doing better with the adjusted medications, and Plaintiff's statements that she prepares simple meals in the microwaves, attends to her personal care, watches television, and reads.  (*Id.* at 25.)

ALJ Banks also discussed Dr. D'Ortona's and Dr. Kamin's opinions that Plaintiff had moderate limitations and found these opinions persuasive insofar as they are consistent with Plaintiff's testimony that she reads as a hobby, shops for necessities, and shows logical, coherent thought processes to treatment providers.  (*Id.* at 27.)

The ALJ determined that Plaintiff retained the RFC to perform work that requires her to understand, remember, and carry out instructions consistent with occupations that can be learned in up to 30 days, but that Plaintiff is limited to simple routine tasks that can be learned in up to 30 days and accommodate the Plaintiff's fair judgment and mild impairment in concentration and memory.  The ALJ also found that Plaintiff requires a goal-oriented setting limited to occasional interaction with the public.  (*Id.*)

At step four, the ALJ found that Plaintiff did not have any past relevant work.  (*Id.*)  At step five, the ALJ considered Plaintiff's vocational factors along with her RFC to conclude that Plaintiff could make a successful adjustment to work existing in significant numbers in the national economy, including dishwasher, hand packager, and price marker, as identified by the VE.  (*Id.* at 28.)  Applying the framework set forth in Medical-Vocational Guideline 204.00, 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ concluded that Plaintiff was not disabled during the Relevant Period and therefore denied her benefits claim.  (*Id.*)

### 4.  Appeal of the ALJ's Decision and Initiation of the Instant Action

Plaintiff requested the Appeals Council review the ALJ's decision on December 23, 2020. (*Id*. at 4-5).  The Appeals Council denied the request for review on January 28, 2022.  (*Id*. at 1-4).  Accordingly, the ALJ's decision became the final decision of the Commissioner.  Plaintiff commenced this action on February 25, 2022 asserting that ALJ Banks failed to properly

evaluate the medical opinion evidence and Plaintiff's subjective allegations in determining Plaintiff's RFC.

## LEGAL STANDARDS

A court reviewing a final decision by the Commissioner must, as a threshold matter, determine whether the ALJ provided the plaintiff with a full and fair hearing under the Secretary's regulations and fully and completely developed the administrative record. *Intonato v. Colvin*, 2014 WL 3893288, at *8 (S.D.N.Y. Aug. 7, 2014) (citation omitted). The duty to develop the record requires the ALJ "to ensure that the record contains sufficient evidence to make a determination." *Bussi v. Barnhart*, 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003). Once the court is satisfied that the plaintiff was afforded a full hearing and the record is fully developed, the court then assesses the Commissioner's conclusions. In doing so, the court is limited to determining whether the Commissioner's conclusions (1) "were supported by substantial evidence in the record," and (2) "were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citation omitted).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted). To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B). The ALJ's decision must set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." *Id*. § 405(b)(1). It must do so "with sufficient specificity to enable the reviewing court to decide whether the determination is

supported by substantial evidence." *Herrera v. Comm'r of Soc. Sec.*, 2021 WL 4909955, at *5 (S.D.N.Y. Oct. 21, 2021) (citation omitted).

That said, the ALJ need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).  If the ALJ fails to consider evidence in the record, the Court must be "able to look to other portions of the ALJ's decision and to clearly credible evidence" to find that the determination was supported by substantial evidence.  *Mongeur*, 722 F.2d at 1040 (citation omitted).  If the Commissioner's findings are supported by substantial evidence, those findings are conclusive.  42 U.S.C. § 405(g); *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

As to the correct legal standard, the Commissioner is required to conduct a sequential five-step inquiry to determine: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) if not, whether the claimant has a "severe impairment" that limits their ability to do basic work activities; (3) if so, whether the impairment is listed in Appendix 1 of the regulations, and what the claimant's RFC is; (4) if the impairment does not qualify as a listed impairment, whether the claimant possesses the RFC to perform their past work; and (5) if the claimant is not capable of performing past work, whether they are capable of performing other work that exists in the national economy.  *Vellone v. Saul*, 2021 WL 319354, at *5 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Vellone on behalf of Vellone v. Saul*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021).  The claimant bears the burden of proof at the first four steps of the analysis, and at the last step, the Commissioner has the burden to show there is other work the claimant can perform.  *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998).

When considering the medical opinions, the Commissioner must consider five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors.  20 C.F.R. §§ 404.1520c(c), 416.920c(c).  The supportability and consistency factors are the "most important," and ALJs must explain how they considered those factors for medical opinions.  *Id*. §§ 416.920a, 416.920c(b)(2).  The supportability inquiry focuses on how well a medical source supported and explained their opinion.  *Vellone,* 2021 WL 319354, at *6.  The question of consistency concerns whether the opinion is consistent with other evidence in the medical record.  *Id.*  The Commissioner is tasked with analyzing medical opinions at the source-level, meaning the Commissioner need not discuss each medical opinion in the record, and may apply the five factors holistically to a single medical source.  20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).  Regarding claims filed on or after March 27, 2017, in evaluating the medical evidence, the Commissioner need not assign particular evidentiary weight to treating physicians as was previously required by the Act.  *Vellone*, 2021 WL 319354, at *6.  However, the regulations continue to recognize the "foundational nature" of the observations of treating sources.  *Steven M.W. v. Comm'r of Soc. Sec.*, 2022 WL 2669491, at *6 (S.D.N.Y. June 17, 2022), *report and recommendation adopted sub nom*., *Washburn v. Comm'r of Soc. Sec.*, 2022 WL 2669296 (S.D.N.Y. July 11, 2022).

## DISCUSSION

### 1.   The ALJ failed to fully develop the record

As an initial matter, the Court is not satisfied that the record was fully developed in this case.  Because Social Security proceedings are inquisitorial rather than adversarial in nature, the ALJ is required to "affirmatively develop" the record.  *Moran v. Astrue*, 569 F.3d 108, 112

(2d Cir. 2009).  As part of this duty, the ALJ must "investigate the facts and develop the

arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 111 (2000).  The

ALJ's duty to develop the record "is particularly important" in cases of mental illness, due to the

difficulty in determining whether an individual with mental illness will be able to adapt to the

workplace, *Hidalgo v. Colvin*, 2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014), and because the

perceived stigma attached to mental illness may cause an individual to minimize her symptoms,

*Primo v. Berryhill*, 2019 WL 2453343, at *13 (S.D.N.Y. Feb. 19, 2019), *report and

recommendation adopted sub nom., Primo v. Comm'r of Soc. Sec.*, 2021 WL 1172248 (S.D.N.Y.

Mar. 29, 2021).

  First, the only functional assessments in the record were completed by the Social

Security consultative examiners and non-examining consultants.  Despite numerous records

from treating psychiatrists including NP Anusionwu, Alison Maling, LCSW, and Dr. Hilaire, there

was no functional report or even a medical questionnaire entered into the record by a treating

provider.  Additionally, the functional assessments on the record from the two consultative

examiners were conducted in June to August 2019, over a year before the hearing was held on

November 2020.  Even the non-examining consultants' reports were prepared in August 2019

and February 2020, the latter of which was still nine months before the November 2020

hearing.

  Further, Dr. D'Ortona and Dr. Kamin appeared not to have examined the records from

VIP Community Services.  (Id. at 65-69, 80-84.)  This was especially problematic because

Plaintiff's mental status examinations and counseling indicated that Plaintiff was in a more

stable period of her illness from May to November 2019 but that Plaintiff's condition

deteriorated after that when NP Anusionwu described a disheveled appearance, Plaintiff's displacement from a previous shelter, and a state of homelessness, (*id.* at 1555), and LCSW Maling described meeting with Plaintiff in December 2019 and talking to Plaintiff about her feelings of being overwhelmed with her mental health and a period of noncompliance with the program (*id*. at 1574-75).  Plaintiff's mental health history is marked by ups and downs, and indeed, that is the nature of bipolar disorder.   In certain periods she has had to be hospitalized and, even after being released from hospitalization, has had trouble complying with medication regimens and attending therapy sessions.  The SSA consultative examiners examined Plaintiff during a somewhat more stable period in her treatment but did not evaluate her treatment records for the more recent period of worsening symptoms.  In fact, only one of the functional assessments, Dr. Kamin's, was obtained after the period when Plaintiff's condition worsened, and she appeared to be in a depressive state.  The ALJ's failure to "make every reasonable effort" to obtain a treating provider's functional assessment and failure to update the record with a more current functional assessment constitutes a failure to fully develop the record.  *See Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 583 (S.D.N.Y. 2022) (finding the ALJ must make "every reasonable effort" to obtain medical evidence necessary to properly make a disability determination from an individual treating health care provider and finding the ALJ erred in failing to obtain a functional assessment from plaintiff's treating provider or an updated record).  This failure to develop the record is particularly concerning in the context of mental illness, which is cyclical in nature.  *See Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (recognizing that "[c]ycles of improvement and debilitating symptoms [of mental illness] are a

common occurrence," and holding that it is legal error for an ALJ to fail to focus only on areas of improvement).

Furthermore, the ALJ did not obtain medical records or opinion evidence to fill gaps about how often Plaintiff would be off task in a workday or how often Plaintiff would need to be absent from work.  This is particularly important here given Plaintiff's reported symptoms from medication and frequent black-outs and panic attacks.  The ALJ did not seek medical opinions to opine on how much Plaintiff would be off task despite Dr. D'Ortona's and Dr. Kamin's opinions that Plaintiff had moderate limitation in completing a normal workday and workweek without interruptions from psychologically based symptoms and in performing at a consistent pace without an unreasonable number and length of rest periods, and despite numerous instances in the records showing Plaintiff missed appointments and Plaintiff's treating providers had discussions with Plaintiff about the importance of attending appointments and being compliant with the medication.  (*Id.* at 1176, 1184, 1197, 1311, 1574, 1753.)

Though Dr. D'Ortona and Dr. Kamin found Plaintiff was not significantly limited in maintaining a schedule and regular attendance, the ALJ must seek additional information to fill in the obvious gaps and internal inconsistencies in the medical opinions on which she relied. *Heuser v. Comm'r of Soc. Sec.*, 2022 WL 970746, at *4-6 (E.D.N.Y. Mar. 31, 2022) (finding the ALJ erred in failing to develop the record to reconcile inconsistencies in medical source opinions).

Further, the ALJ made the RFC determination based on Plaintiff's abilities while attending a court-ordered outpatient program that involved counseling, group therapy, and

other medical visits multiple times a week, when some of the records indicate that Plaintiff

exhibited a lack of awareness of her own condition and that she would not comply with medical

treatment but for a court-order.  The ALJ made no finding regarding Plaintiff's ability to

maintain a regular work schedule or how often she may need to miss work due to her regular

medical visits and documented history of missing medical appointments.  Plaintiff also testified

that she was fired from her previous job for excessive absences.  The ALJ failed to inquire about

or reconcile this evidence that Plaintiff would struggle to stay on task and meet attendance

requirements.

    2.  **The ALJ erred in evaluating Plaintiff's ability to adapt and manage herself**

      Plaintiff contends that the ALJ erred in evaluating Dr. Sebold's opinion, particularly in

finding Dr. Sebold's opinion that Plaintiff had a "moderate to marked" limitation in regulating

emotions, controlling behavior, and maintaining well-being to be unpersuasive.  Instead, the

ALJ determined that Plaintiff had a mild limitation in her ability to adapt and manage herself.

The ALJ found that while Plaintiff does not have a driver's license and has difficulty shopping

because of interacting with others, Plaintiff could shop in stores, attend to her personal care,

and read as her hobby.  (*Id.* at 24.)  ALJ Banks also stated that Dr. Sebold's opinion was not

supported by Plaintiff's cooperative behavior, full range affect, normal speech, and appropriate

affect upon mental status examination to treatment providers.

      In considering Dr. Sebold's opinion, ALJ Banks did not provide adequate reasons for

discounting the opinion of the Social Security Office's own examiner.  The ALJ stated in a

conclusory manner that the opinion was not supported by mental status examinations

conducted by treatment providers but only referenced the mental status exams that supported

her findings—cherry picking records that supported the finding.  In the context of mental illness, the Second Circuit has cautioned against relying on isolated mental status exams to draw conclusions about a patient's abilities.  *See, e.g.*, *Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (explaining that mental status exams only reveal the patient's mental state "at the time of the examination and do not consider symptoms the patient may experience outside of that brief period of time").  Rather, particularly with mental illness, it is important to assess the patient's symptoms over time.  There are many points in Plaintiff's treatment record where the same treatment providers whose records were cited by the ALJ as reflecting normal findings, found that that Plaintiff had "rushed and hurried speech" (A.R. 1184) and a flat or fair affect (*id.* At 1217, 1511, 1557).  By ignoring these mental status exams, the ALJ impermissibly cherry-picked from the record, which amounts to legal error.  *See Stacey v. Comm'r of Soc. Sec. Admin.*, 799 F. App'x 7, 11 (2d Cir. 2020) (finding it improper to rely on mental status evaluations to conclude that the plaintiff was capable of prolonged concentration while "ignoring the contrary conclusion of the very physicians who made the evaluations"); *Anderson v. Kijakazi*, 2022 WL 938115, at *8 (S.D.N.Y. Mar. 3, 2022), *report and recommendation adopted sub nom., Anderson v. Comm'r of Soc. Sec.*, 2022 WL 925070 (S.D.N.Y. Mar. 29, 2022) (ALJ erred in discounting a medical opinion because he found the plaintiff "show[ed] mostly normal mental status examinations," where in fact the record demonstrated that the plaintiff's wellbeing fluctuated over time).

Also, ALJ Banks did not discuss the evidence in the record outside of the mental status exams that supports Dr. Sebold's finding of Plaintiff's "moderate to marked" limitation in regulating emotions, controlling behavior, and maintaining well-being.  This evidence includes

Plaintiff's intermittent noncompliance with her treatment program and medication regimen, Plaintiff's history of psychiatric hospitalizations as recently as March 2019, Plaintiff's unstable housing situation, and treatment providers' observations of mood lability, impulsivity, and a disheveled appearance.  (A.R. 1215, 1226-28, 1555, 1574-75).  Further, ALJ Banks failed to consider the fact that Dr. Sebold reached his opinions after examining the Plaintiff – a factor that bears on supportability – while Dr. D'Ortona and Dr. Kamin reached their conclusions after reviewing only a partial record of Plaintiff's treatment history.  *See Bey v. Comm'r of Soc. Sec.*, 2023 WL 1098183, at *9 (S.D.N.Y. Jan. 30, 2023) (ALJ erred in failing to accord proper weight to the supportability of medical source's opinion by relying on non-examining SSA consultative psychologist over SSA consultative psychologists and treating providers).

As to consistency, the ALJ assessed that Dr. Sebold's opinion was not consistent with Plaintiff's ability to shop in stores, attend to her personal care, and read as her hobby. However, Plaintiff did not testify that she is able to concentrate while reading and indicated on her function report that she does not finish what she starts when reading.  (A.R. 212.)  She also testified that she was able to engage in personal care but only testified that she is able to prepare simple meals for herself by using the microwave.  (*Id.* at 792.)  On Plaintiff's ability to shop, ALJ Banks confusingly seems to credit Plaintiff's testimony that she has difficulty shopping because of interacting with others, but also primarily based her conclusion that Plaintiff had a mild limitation in adapting and managing herself on the fact that she could shop in stores without reconciling the opposing statements.  The ALJ's characterizations thus reflect impermissible cherry picking.  *See Gough v. Saul*, 799 F. App'x 12, 14 (2d Cir. 2020) (summary order) ("We fear that the ALJ cherry-picked evidence from the record to support his conclusion

that [the plaintiff] could work full time even though the record as a whole suggested greater

dysfunction.").  Further, the ability to perform activities such as cooking, cleaning, reading, and

watching television as Plaintiff described she did does not amount to the ability to concentrate

for an extended period.  *See Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022)

(finding that although the plaintiff engaged in activities "such as reading and playing games on

her phone, these activities did not show that [she] could hold down a steady job for an

extended period of time").  Accordingly, the ALJ erred in evaluating and discussing the medical

evidence.

The ALJ's errors were not harmless because a finding of a moderate to marked

limitation in adapting and managing herself would likely result in a revised RFC that might

impact whether there are any jobs in the economy that Plaintiff can perform.

**3.  The ALJ's RFC determination was not supported by substantial evidence**

Plaintiff also contends that the ALJ erred in not incorporating the non-examining state

agency consultants' opinions in her RFC finding while claiming to find them persuasive.  Dr.

D'Ortona and Dr. Kamin found moderate limitations in nine areas involving her ability to

(1) remember locations and work-like procedures; (2) maintain attention and concentration for

extended periods; (3) complete a normal workday and workweek without interruptions from

psychologically based symptoms and perform at a consistent pace without an unreasonable

number and length of rest periods; (4) interact appropriately with the general public; (5) accept

instructions and respond appropriately to criticism from supervisors; (6) get along with co-

workers or peers without distracting them or exhibiting behavioral extremes; (7) respond

appropriately to changes in the work setting; (8) be aware of normal hazards and take

appropriate precautions; and (9) set realistic goals or make plans independently. (A.R. 73-74, 88-90.) In finding these persuasive, the ALJ stated that the evidence reflects Plaintiff reads for her hobby, shops for necessities, and shows logical, coherent thought processes to treatment providers, which demonstrates she can perform simple tasks. (*Id.* at 27.) Plaintiff argues that it is unclear how the ALJ's RFC determination accounted for the moderate limitations noted by the agency's own consultants.

While ALJ Banks stated that she found the consultative opinions persuasive, she did not incorporate moderate limitations they found in Plaintiff's ability to interact with coworkers and supervisors. ALJ Banks's RFC found that Plaintiff is limited to occasional interaction with the public but remains able to interact appropriately with supervisors and co-workers. The ALJ found this was supported by objective observations of Plaintiff's appropriate eye contact, normal speech, and normal affect, cooperative behavior with providers, and the fact that she actively participated in group therapy sessions. (*Id.*) However, as described above, the ALJ mischaracterizes the objective mental status exams, particularly Plaintiff's affect. Also, Plaintiff's attending group therapy where she interacts with others in a controlled, therapeutic environment is not indicative of how Plaintiff would react to coworkers. The ALJ's finding is problematic considering that the non-examining agency consultants opined that Plaintiff had moderate limitations in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Sebold similarly found moderate limitations in Plaintiff's ability to interact adequately with supervisors, co-workers, and the public. While ALJ Banks

28

said that she found these opinions persuasive, ALJ Banks inexplicably found that Plaintiff could react appropriately with supervisors and co-workers, a conclusion that is not backed by any of the medical source opinions or evidence in the record.  *See Janita H. v. Comm'r of Soc. Sec.*, 2023 WL 196158, at *7 (S.D.N.Y. Jan. 17, 2023) (holding that the ALJ erred when it added a limitation to plaintiff's RFC regarding interaction with coworkers but failed to consider or add limitations with respect to supervisors or the public)

ALJ Banks also purported to devise an RFC determination that made accommodations for Plaintiff's limitations regarding her ability to perform the mental demands of work.  This RFC determination said that Plaintiff was able to perform the mental demands of work that requires her to understand, remember, and carry out instructions consistent with occupations that can be learned in up to 30 days.  (A.R. 27.)  The ALJ stated that a "limitation to simple routine tasks that can be learned in up to 30 days accommodates the claimant's fair judgment and mild impairment in concentration and memory as recorded by Dr. Sebold and NP Anusionwu."  (*Id.*) However, Dr. Sebold found that Plaintiff had fair to poor insight and judgment.  Further, NP Anusionwu often observed fair judgment but coupled that finding with a finding of poor insight, contradicting the idea that "fair judgment" was a positive or even neutral observation.  (*Id.* at 1217, 1228, 1241, 1247, 1262, 1283.)

Also, Dr. D'Ortona and Dr. Kamin found moderate limitations in Plaintiff's ability to remember locations and work-like procedures, maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  Moderate limitations can be consistent with a capacity to

perform unskilled work.  *See DelCarmen Fernandez v. Berryhill*, 2019 WL 667743, at *9 (S.D.N.Y.

Feb. 19, 2019).  However, the ALJ did not provide an explanation on how the limitations

impacted Plaintiff's ability to perform this work while also stating that she found these opinions

persuasive.  This error warrants remand.  *Stellmaszyk v. Berryhill*, 2018 WL 4997515, at *28

(S.D.N.Y. Sept. 28, 2018) (finding ALJ erred and remand was appropriate where it was unclear

how the ALJ incorporated plaintiff's moderate limitations in account while determining

plaintiff's RFC).

These errors were not harmless because a finding that Plaintiff might have additional

limitations may warrant further limitations to her RFC.  For example, at the hearing, the VE

opined that someone who was off task more than 10% of the time or was moderately limited in

interacting with others would not be able to work, but the ALJ never reconciled whether the

various moderate limitations that the medical source opinions found constituted a likelihood

that she would be off task more than 10% of the time.  *See Stellmaszyk*, 2018 WL 4997515, at

*27-28 (finding the ALJ erred in failing to incorporate moderate limitations leading to an

incomplete analysis by the VE).  Therefore, remand is warranted.

### 4.  The ALJ erred in evaluating Plaintiff's subjective statements

Plaintiff also contends that the ALJ erred in evaluating Plaintiff's subjective statements

regarding the intensity of her symptoms and limitations. At the hearing, Plaintiff testified about

her ability to work, psychological symptoms, her anxiety attacks, black outs, panic attacks, and

being argumentative and isolating at home.  (A.R. 42-56.)  Plaintiff also testified that she

attempted to work in a factory but was fired after a week for calling out of work too many

times because of anxiety attacks.  (*Id.* at 42-43.)  The ALJ found Plaintiff's medically

determinable impairments could be expected to cause the symptoms, but that her statements about the intensity, persistence, and limiting effects of these symptoms were not consistent with the medical evidence.  The ALJ also found that Plaintiff's symptoms had improved after inpatient treatment in February 2019, that Plaintiff had unremarkable mental status examinations, and that her mother told Dr. Finegan she seemed to be doing better.  (*Id.* at 22.)

An ALJ "is not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  *Barry v. Colvin*, 606 F. App'x 621, 622-23 (2d Cir. 2015) (internal quotations omitted).  However, an ALJ must determine if the plaintiff's statements are consistent with the treatment record.  *See Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010) ("The issue is ... whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her pain are consistent with the objective medical and other evidence.").

Here, the ALJ disregarded Plaintiff's statements in favor of mental status examinations that were cherry-picked for observations and other anecdotes that supported the ALJ's determination.  *Scognamiglio v. Saul*, 432 F. Supp. 3d 239, 252 (E.D.N.Y 2020) (finding ALJ's choice "to disregard [plaintiff's] statements in favor of a handful of anecdotes that would seem to indicate Plaintiff's normal functionality" was error).  The ALJ failed to determine whether Plaintiff's testimony was consistent with the record evidence.  *See Correale-Englehart*, 687 F. Supp. 2d at 435.  Further, instead of weighing Plaintiff's testimony for consistency with the record evidence, the ALJ focused on some statements that her symptoms had improved after in-patient care in February 2019.  While statements about improving symptoms may be helpful,

improvement does not necessarily mean that Plaintiff's symptoms were not as severe as she described, particularly given the cyclical nature of mental illness.  Therefore, the ALJ erred in evaluating Plaintiff's subjective statements regarding her symptoms, and remand is warranted.

**CONCLUSION**

For the reasons stated above, Plaintiff's motion for judgment on the pleadings is GRANTED and Defendant's motion for judgment on the pleadings is DENIED.  This case is remanded for reconsideration by the ALJ consistent with this opinion.

**The Clerk of the Court is respectfully directed to enter a final judgment remanding the case and to close the case.**

**SO ORDERED.**

Dated: August 7, 2023
     New York, New York

_____
    KATHARINE H. PARKER
    United States Magistrate Judge